ACE AMERICAN INSURANCE COMPANY,            )
                                           )
                    Plaintiff,             )
                    Counter-defendant,     )
                                           )
          v.                               )    No. 07 C 5037
                                           )
RC2 CORPORATION, INC.,                     )
LEARNING CURVE BRANDS, INC.,               )
LEARNING CURVE INTERNATIONAL, INC.,        )
                                           )
                    Defendants             )
                    Counter-Claimants.     )

## OPINION AND ORDER

Plaintiff ACE American Insurance Co. seeks a declaration

that it does not have a duty to defend defendants RC2

Corporation, Inc.; Learning Curve Brands, Inc.; and Learning

Curve International, Inc. in lawsuits based on defendants'

alleged sale of children's toys containing lead paint. The toys

were manufactured in China, but all the lawsuits were brought in

the United States and are based on harm caused by using the toys

in the United States. The pertinent provisions of the four

insurance policies at issue (the "ACE Policies") are identical

except that each policy covers a different time period.

Plaintiff contends there is no duty to defend based on a coverage territory provision limited to territory outside the United States. Plaintiff also contends that a number of other provisions exclude coverage.[1] Defendants have counterclaimed for a declaration and related claims that there is a duty to defend. Presently pending are cross motions for summary judgment. The parties agree that Illinois law applies to all the claims in this case. There is complete diversity of citizenship and the amount in controversy exceeds $75,000.

Plaintiff moves for summary judgment based on the coverage territory provision. Defendants move for summary judgment declaring there is a duty to defend, which would require that defendants succeed on the coverage territory issue as well as all the other provisions and exclusions that plaintiff contends preclude a duty to defend. There is no factual dispute as to the contents of the ACE Policies or the contents of the underlying complaints that have been filed against defendants.

It is undisputed that all the underlying complaints allege harm to persons[2] or property[3] located in the United States

---

[1]The coverage territory issue is set forth in Count I of the Complaint. Count II is based on all other provisions.

[2]For present purposes, it is unnecessary to distinguish between the parents who may be the formal plaintiffs in the underlying litigation and their children who allegedly were harmed. There is also no need to distinguish between named class

- 2 -

and that the harm allegedly was caused by toys that were manufactured in China and contained lead paint that was applied in China. The parties dispute construction of the coverage territory and occurrence provisions of the ACE Policies. The dispute essentially poses the question of whether occurrence, as used in relation to the coverage territory provision, refers to the allegedly improper application of lead paint, which occurred outside the United States, or only refers to alleged injury to plaintiffs and their property coming into contact with the lead from the painted toys within the United States.

Each of the ACE Policies provides commercial general liability coverage. Each has a subsection of "Bodily Injury and Property Damage Liability" entitled "Insuring Agreement" which includes the following language: **"We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. . . . This insurance applies only to 'bodily injury' and 'property damage' which occurs during the Policy Period. The 'bodily injury' or 'property damage' must be caused by an**

members and putative class members. "Underlying plaintiffs" will be used to refer to both named and putative plaintiffs and to both the parents and children.

[3]Some of the underlying complaints allege that lead from defendants' products contaminated other property.

**'occurrence.' The 'occurrence' must take place in the 'coverage territory.'"[4]** The ACE Policies define **"occurrence"** as **"an accident, including continuous or repeated exposure to substantially the same general harmful conditions."** With limited exceptions and refinements not at issue here, coverage territory includes all of the world outside of the United States.

In Illinois the interpretation of an insurance policy is a question of law. <u>BASF AG v. Great Am. Assurance Co.</u>, 522 F.3d 813, 818-19 (7th Cir. 2008).

> "A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed by the language of the policy." [<u>Valley Forge Ins. Co. v. Swiderski Elecs., Inc.</u>, 223 Ill. 2d 352, 860 N.E.2d 307, 314 (2006)]; <u>see also</u> <u>Cent. Ill. Light Co. v. Home Ins. Co.</u>, 213 Ill. 2d 141, 821 N.E.2d 206, 213 (2004). "In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." <u>Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.</u>, 223 Ill. 2d 407, 860 N.E.2d 280, 286 (2006). Where the terms of an insurance policy are clear and unambiguous, they must be applied as written; but where ambiguity exists, the terms will be strictly construed against the drafter. <u>Id.</u> at 286; <u>Valley Forge Ins. Co.</u>, 860 N.E.2d at 314. Policy terms "are ambiguous if they are reasonably susceptible

---

[4]For simplicity in writing "'bodily injury' or 'property damage'" as used in the ACE Policies will be referred to jointly as "Harm."

> to more than one interpretation, not simply
> if the parties can suggest creative
> possibilities for their meaning, and a court
> will not search for ambiguity where there is
> none." <u>Valley Forge Ins. Co.</u>, 860 N.E.2d at
> 314 (internal citations omitted).

<u>BASF</u>, 522 F.3d at 819. In considering the meaning of policy

terms, governing legal authority must also be taken into

consideration; "a policy term may be considered unambiguous where

it has acquired an established legal meaning." <u>Nicor</u>, 860 N.E.2d

at 286.

At issue in this case is plaintiff's duty to defend, not

any duty to indemnify. An insurer's duty to defend against a

lawsuit is broader than the insurer's duty to indemnify any

liability that is imposed or settled upon. <u>Stoneridge</u>

<u>Dev. Co. v. Essex Ins. Co.</u>, ___ Ill. App. 3d ___, ___ N.E.2d

___, 2008 WL 1976617 *7 (2d Dist. May 6, 2008); <u>BASF</u>, 522 F.3d

at 819. The "duty to defend arises if, liberally construing in

the insured's favor the allegations in the underlying complaint

against the insured, there are factual allegations that even

potentially fall within the coverage. <u>General Agents Insurance</u>

<u>Co. of America, Inc. v. Midwest Sporting Goods Co.</u>, 215 Ill. 2d

146, 154-55, 828 N.E.2d 1092 (2005). Moreover, if the underlying

complaint against the insured contains several theories of

recovery and only one of the theories is potentially covered, the

insurer must still defend the insured. <u>Midwest Sporting Goods Co.</u>, 215 Ill. 2d at 155, 828 N.E.2d 1092. In this manner, the insurer may become obligated to defend against causes of action and theories of recovery that the policy does not actually cover. <u>Illinois Masonic Medical Center v. Turegum Insurance Co.</u>, 168 Ill. App. 3d 158, 162, 522 N.E.2d 611 (1988)." <u>Stoneridge</u>, ___ N.E.2d at ___, 2008 WL 1976617 at *7. <u>Accord</u> <u>BASF</u>, 522 F.3d at 819.

The parties do not cite and this court has not found any Illinois case law that decides the particular issue before this court. Plaintiff cites a case from another jurisdiction, involving coverage for injuries to American soldiers in Vietnam caused by Agent Orange manufactured in the United States, which collects cases which it cites for the proposition: "In a variety of related settings, the courts have consistently held that the place where the injury happened is the location of the occurrence." <u>Diamond Shamrock Chem. Co. v. Aetna Cas. & Sur. Co.</u>, 609 A.2d 440, 470 (N.J. Super. A.D. 1992). Plaintiff, though, does not attempt to consider the particular policy language or circumstances involved in the collected cases. As <u>Diamond Shamrock</u>, 609 A.2d at 471, notes for the issue before that court, the other cases are not dispositive; the particular circumstances of the pending case had to be considered, together

- 6 -

with the language of the policies at issue. In the present case, the particular language of the ACE Policies must be considered, with appropriate deference accorded to prior court interpretation of the same or similar policy language. See Rich v. Principal Life Ins. Co., 226 Ill. 2d 359, 875 N.E.2d 1082, 1091 (2007); Nicor, 860 N.E.2d at 286.

Plaintiff contends that Illinois follows the majority of jurisdictions which generally determine the time and place of an occurrence based on the resulting harm (effects), while determining the number of occurrences based on the originating cause. See Diamond Shamrock, 609 A.2d at 470-71. Since courts often apply the same effects rule to both time and place, see Farmers Alliance Mut. Ins. Co. v. Salazar, 77 F.3d 1291, 1296 (10th Cir. 1996); Keystone Automated Equip. Co. v. Reliance Ins. Co., 535 A.2d 648, 651 (Pa. Super. 1988), plaintiff contends that Illinois applying the effects rule to the timing of an occurrence supports that Illinois would also apply the effects rule to determining the place of an occurrence. Again, however, any general rules like this can only be applied if consistent with the particular language of the insurance policy at issue.

Illinois cases do generally hold that "an occurrence policy is not triggered unless loss to the claimant happened while that policy was in force." Great Lakes Dredge & Dock

Co. v. City of Chicago, 260 F.3d 789, 795 (7th Cir. 2001). Such holdings, however, are generally based on specific language in the applicable policy that limit coverage to damage or injury in the policy period, not just language providing that an occurrence be during the policy period. See id. (policies "defining 'property damage' as an 'accident or happening or event [that] . . . results in a . . . physical injury to . . . tangible property . . . during the policy period'"); Pekin Ins. Co. v. Janes & Addems Chevrolet, Inc., 263 Ill. App. 3d 399, 636 N.E.2d 34, 37 (4th Dist. 1994) (policy defined "property damage" as "physical injury to or destruction of tangible property which occurs during the policy period;" another "was a commercial lines policy covering property damage which occurred '[d]uring the policy period shown in the [d]eclarations'"); Seegers Grain Co. v. Kansas City Millwright Co., 230 Ill. App. 3d 565, 595 N.E.2d 113, 114 (1st Dist. 1992) ("The property damage covered under completed operations coverage was expressly defined in the policy to include only property damage which 'occurs during the policy period.'"). If the ACE Policies stated that the underlying Harm must occur within the United States, these cases would support plaintiff's contention. The ACE Policies, however, contain no such provision.

The policy language at issue in <u>Great Am. Ins. Co. v.</u>
<u>Tinley Park Recreation Comm'n</u>, 124 Ill. App. 2d 19, 259 N.E.2d
867 (1st Dist. 1970), is closer to that at issue in the present
case. In that case, a public entity obtained a short-term
insurance policy covering a fireworks display. Allegedly, the
clean-up crew left behind an unexploded fireworks bomb. This
alleged negligence happened before the period of coverage
expired. After the end of the coverage period, a child found the
unexploded bomb and was injured. The insurer denied coverage on
the ground that the incident fell outside the coverage period. A
coverage provision of the policy provided that the insurer agreed
"to pay on behalf of the insured all sums which the insured shall
become legally obligated to pay as damages because of bodily
injury, sickness or disease, including death at any time
resulting therefrom, sustained by any person, caused by accident
and arising out of the hazards hereinafter defined." <u>Id.</u> at 868.
A limitation was that the "policy applies only to those accidents
which occur during the policy period." <u>Id.</u> The insured argued
that an accident consists of all the causative conduct as well as
the injury and therefore can occur over a period of time. The
insured further argued that the accident began when the bomb was
not picked up and was consummated when the child was injured and,
since the beginning conduct occurred within the policy period,

the accident occurred, in part, during the policy period and should be covered. The Illinois Appellate Court rejected this argument, holding that an accident does not occur until consummated, that is, "until all the factors of which it is comprised combine to produce the force which inflicts injury." Id. at 869.

While closer than the other timing cases, the policy language at issue in Great American is still distinguishable. The language of the ACE Policies refer to Harm that is "caused by an 'occurrence.'" Thus, here the occurrence is separately identified as being the cause of the Harm. The Harm is not itself part of the occurrence. In Great American, the term "accident" was not specifically defined by the policy so the court applied a common understanding of that word, which it deemed to include the injury itself.[5] In the ACE Policies, an

---

[5]The coverage provision in Great American refers to "damages . . . caused by accident." In that provision, though, "accident" is used as part of the adverbial phrase "by accident," not as a noun. In other words, it is the same as saying: damages that are accidentally caused. If accident were used as a noun in this provision, the phrase would have been "damages caused by an accident." But even if "accident" used in the coverage provision were to be deemed synonymous with using "accident" as a noun in the policy period limitation, "accident" is being used differently than "occurrence" in the ACE Policies. The Great American coverage provision refers to "damages" (because of injury) caused by accident, not the injury itself being caused by accident. In order to cause damages, there must be both the accidental conduct and injury or another loss-inducing harm. Thus, even construing the coverage provision

occurrence is a cause of Harm, not the Harm itself. Additionally, the ACE Policies only require that the occurrence take place in the coverage territory, not that the Harm also occur there.

Plaintiff also contends that Illinois cases follow the majority position that the place of an occurrence is determined by the effects test, that is, where the harm occurred. The two cases cited, however, are both cases involving premises coverage. Both decisions cited are based on application of language particular to premises coverage. They are not based on Illinois cases adopting the effects test as being generally applicable to determining the place of an occurrence. See United States Fire Ins. Co. v. Schnackenberg, 88 Ill.2d 1, 429 N.E.2d 1203 (1981); Cobbins v. General Accident Fire & Life Assurance Corp., 53 Ill. 2d 285, 290 N.E.2d 873 (1972). These cases are not guidance for construing the ACE Policies.

The Illinois cases that defendants cite to support their position are all cases involving the determination of the number of occurrences. Plaintiff seeks to distinguish these cases on the ground that, under the majority view, the cause test applies

in Great American as meaning "damages caused by an accident," that construction would be fully consistent with the Illinois Appellate Court's determination that accident includes the injury itself.

to determining the number of occurrences, while the effects test applies to place and timing. Like the cases that plaintiff cites in support of its position, the cases cited by defendants are generally distinguishable based on the language contained in the particular policies. Three of the cases cited by defendants had policy provisions expressly defining injuries caused by the same condition or a series of events as one occurrence. See United States Gypsum Co. v. Admiral Ins. Co., 268 Ill. App. 3d 598, 643 N.E.2d 1226, 1259 (1st Dist. 1994) ("all such injury or destruction caused by continuous or repeated exposure to substantially the same condition shall be deemed to result from one occurrence"); Household Mfg., Inc. v. Liberty Mut. Ins. Co., 1987 WL 6611 *2 (N.D. Ill. Feb. 11, 1987), vacated in part on other grounds, 1987 WL 20137 (N.D. Ill. Nov. 16, 1987) ("all 'personal injury' and all 'property damage' arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered as arising out of one occurrence"); John Crane, Inc. v. Admiral Ins. Co., 2006 WL 1010495 *6, 9, 11 (Cir. Ct. Cook County, Ill. April 12, 2006) ("all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence" and "all loss arising out of continuous or repeated exposure to

substantially the same conditions shall be considered as arising out of one occurrence"). While each of these cases refers to Illinois courts generally construing insurance policies as providing that injuries arising from a common cause are a single occurrence, each also had policy language pointing to such a conclusion.

In the other case cited by defendants, the Illinois Supreme Court focused on causation in stating the general rule in Illinois for determining whether there is one or more occurrences. "[W]here each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, Illinois law will deem each such loss to have arisen from a separate occurrence within the meaning of liability policies containing language similar to that used in the policies [at issue in this case]. . . . By contrast, where the damages for which coverage is sought resulted from the manufacture and sale of defective products or a fraudulent sales scheme, the loss will be found to have emanated from a single cause and there will be but one occurrence for purposes of the applicable policies." Nicor, 860 N.E.2d at 294. Still, the court looked to the

particular language of the policies at issue in determining

whether the general rule should be applied.[6]

> As we have previously discussed, the
> relevant policies in effect between 1961 and
> 1976 define an occurrence as "one happening," or
> a series of happenings arising out of or due to
> "one event," while the policies for 1976 through
> 1978 speak of "an accident" or "event" or
> "continuous or repeated exposure to conditions
> which result in [injury, death or physical
> damage to or destruction of property]." Nothing
> in these definitions is materially different
> from the definitions employed in the various
> Illinois appellate court decisions to which the
> appellate court looked for guidance, and they
> are no more ambiguous in this case than they
> were in those cases. Giving the words of the
> policies their plain and ordinary meaning, as we
> must, the 195 spills were not "one happening,"
> they were not derived from "one event," and they
> were not all part of "an accident." Moreover,
> they cannot be characterized as involving
> "continuous or repeated exposure to conditions
> which result in [injury, death or physical
> damage to or destruction of property]." They
> were sporadic, not part of an uninterrupted
> process, and in no instance evident in the
> record was any customer's home ever subject to
> more than one exposure to mercury contamination.
> The exposure therefore could not have been
> "repeated."

Id. at 295-96.

The foregoing discussion reveals there is no case law

giving the language of the ACE Policies an established legal

---

[6]In Nicor, the claims against the insured natural gas
company were based on mercury contamination in some individual
residences when the company removed meters that had contained
mercury. See Nicor, 860 N.E.2d at 282-84.

- 14 -

meaning that should be applied. See Rich, 875 N.E.2d at 1091; Nicor, 860 N.E.2d at 286. Instead, the particular language of the ACE Policies must be construed. As the previous discussion indicates, the Ace Policies distinguish between Harm and the occurrence that causes it. It is the cause of the Harm that must occur within the coverage territory. Citing Farmers Alliance, 77 F.3d at 1296, plaintiff contends the focus should be on the immediate cause of the injury, which occurred in the United States when people or other property came into contact with the toys. Relying on the "one occurrence" cases they cite, defendants contend the focus should be on the common cause of improper manufacture that occurred in China. Consistent with the language of the ACE Policies, however, it is unnecessary to focus on one cause or the other.

It is a well-recognized tort principle that there can be more than one proximate cause of an injury. Williams v. Manchester, 372 Ill. App. 3d 211, 864 N.E.2d 963, 975-76 (1st Dist. 2007) (collecting cases), aff'd in part, rev'd in part on other grounds, 228 Ill.2d 404, ___ N.E.2d ___, 2008 WL 879036 (April 3, 2008); Kindernay v. Hillsboro Area Hosp., 366 Ill. App. 3d 559, 851 N.E.2d 866, 875-76 (5th Dist. 2006). Both the negligent manufacture of the toys and the paint leaching lead onto the underlying plaintiffs and property are proximate causes

alleged in the underlying complaints. Both predicates must have occurred for Harm to be caused. The occurrence alleged in the underlying complaints took place in China. Thus, the occurrence took place within the coverage territory and the Harm took place in the United States. Turning to the language of the pertinent provision of the ACE Policies, coverage is not precluded in such a situation. The language is written in the positive. For there to be coverage, the occurrence must take place in the coverage territory. It is not required that the Harm take place in the coverage territory but only during the Policy Period. In this situation the occurrence took place in the coverage territory of China. By contrast, if the provision had been written in the negative, the result could be different. If there had been an exclusion providing that there is no coverage for Harm that took place inside the United States, then the case would fall under such an exclusion.

For the foregoing reasons, plaintiff cannot deny a defense based on the underlying complaints alleging occurrences outside the coverage territory. Plaintiff's motion for summary judgment will be denied. Defendants are entitled to summary judgment dismissing Count I of the Complaint. Since the coverage territory issue is resolved in defendants' favor, it must be considered whether undisputed facts support that defendants are

entitled to summary judgment regarding all, some, or none of the provisions raised in Count II of the Complaint. Although not raised in their opening brief, in response to defendants' motion for summary judgment plaintiff contends that it is entitled to summary judgment in its favor based on some of the provisions raised in Count II. Defendants must succeed on all of these issues to eventually be entitled to a judgment. Plaintiff need only succeed on one issue to be entitled to summary judgment declaring that it has no duty to defend.

In Count II of its Complaint, plaintiff raises the following issues as precluding a duty to defend.

> (1) the underlying suits do not allege "bodily injury" within the meaning of the [ACE Policies] and do not seek sums that the insured is legally obligated to pay as damages because of "bodily injury;" (2) the underlying suits do not allege "property damage" within the meaning of the [ACE Policies] and do not seek sums that the insured is legally obligated to pay as damages because of "property damage;" (3) the underlying suits do not allege an "occurrence" within the meaning of the [ACE Policies]; (4) the underlying suits are barred by the "business risk" exclusions in the [ACE Policies]; (5) the underlying suits are barred by the sistership and "expected and intended" exclusions in the [ACE Policies]; (6) the underlying suits are barred by the pollution exclusion in the [ACE Policies]; and (7) the recovery sought in the underlying suits does not qualify as "damages" within [the] meaning of the [ACE Policies].

Compl. ¶ 44. These same provisions are raised as the Third
Affirmative Defense to the Counterclaim.

Defendants move for summary judgment denying all these
contentions. In response, plaintiff does not dispute that (2),
(3), and (6) are inadequate grounds for denying a defense. Those
issues will be resolved in defendants' favor. Plaintiff also
contends in a footnote that there are factual disputes regarding
additional issues that would preclude summary judgment in
defendants' favor. Pl. Reply at 16 n.4. Plaintiff asserts that
there are factual disputes regarding defendants providing proper
notice; whether the Learning Curve defendants (which are both
subsidiaries of RC2) are insureds under the ACE Policies; and
whether defendants understood the consequences of lead paint on
the toys. These additional issues are not alleged in the
Complaint nor raised as defenses to the Counterclaim. In answer
to ¶ 15 of the Counterclaim, though, plaintiff admits that
defendants have tendered some of the underlying lawsuits for a
defense, but not all of them. The issues that are expressly
raised in Count II and as affirmative defenses will be considered
first.

The ACE Policies define **"bodily injury"** as **"bodily
injury, sickness or disease sustained by a person, including
death resulting from any of these at any time."** All the

underlying complaints allege purchases of toys with lead paint.
All expressly or impliedly allege underlying plaintiffs were
exposed to lead.  Some also allege that underlying plaintiffs
inhaled or ingested lead from the toys.  One complaint alleges
that a named plaintiff's son had "high end" lead levels after
putting toys in his mouth.  A different complaint alleges that a
named plaintiff's son was ill and vomited during the time he
regularly slept with a lead-painted toy, but does not seek
damages for that suffering.  All the complaints allege that even
minimal exposure to lead is harmful to the body and that the
harmful effects may go undetected for long periods of time.

As previously stated, bodily injury includes bodily
injury, sickness, or disease.  Defendants contend that exposure
to lead is enough to satisfy the bodily injury subdefinition,
which is distinct from the sickness and disease subdefinitions.
Alternatively, defendants contend the complaints show that the
underlying plaintiffs potentially seek a recovery for bodily
injury.  The latter issue need not be reached because Illinois
case law construing the same policy language holds that exposure
to potentially harmful contaminants constitutes bodily injury
even without manifestations of sickness or disease.  See Zurich
Ins. Co. v. Raymark Indus., Inc., 118 Ill. 2d 23, 514 N.E.2d 150,
161 (1987) (asbestos exposure); John Crane, 2006 WL 1010495 at

*12-13 (same); <u>Mason v. Home Ins. Co. of Ill.</u>, 177 Ill. App. 3d 454, 532 N.E.2d 526, 531 (3d Dist. 1988) (bodily injury from ingesting botulism-tainted food first occurred when the food was eaten, not when symptoms later occurred); <u>Pak v. Admiral Ins. Co.</u>, 2004 WL 2931322 *7 (N.D. Ill. Dec. 9, 2004) (taking diet pill that could cause heart attack). Consistent with these cases, bodily injury occurs when a person is first exposed to lead. <u>See</u> <u>Chantel Assoc. v. Mount Vernon Fire Ins. Co.</u>, 656 A.2d 779, 785-86 (Md. 1995); <u>United Serv. Auto. Ass'n v. Riley</u>, 899 A.2d 819, 831-32 (Md. 2006). Since all the underlying complaints allege exposure to lead, the underlying complaints all involve bodily injury. Count II will be dismissed to the extend it is based on there being a lack of bodily injury.

Plaintiff contends there is no duty to defend because the damages sought in the underlying suits are not **"damages because of 'bodily injury' or 'property damage'"** as is required for coverage under the ACE Policies. The ACE Policies do not specifically define the term "damages." When left undefined in a comprehensive general liability policy such as the ACE Policies, Illinois law accords "damages" a broad, nontechnical meaning that is not limited to compensatory damages and can include equitable relief. <u>Central Ill. Light</u>, 821 N.E.2d at 217-18; <u>Outboard Marine Corp. v. Liberty Mut. Ins. Co.</u>, 154 Ill. 2d 90, 607 N.E.2d

1204, 1215-16 (1992); General Star Indemn. Co. v. Lake Bluff Sch. Dist. No. 65, 354 Ill. App. 3d 118, 819 N.E.2d 784, 793-94 (2d Dist. 2004). Plaintiff cites O'Brien & Assoc., P.C. v. Tim Thompson, Inc., 274 Ill. App. 3d 472, 653 N.E.2d 956, 961 (2d Dist. 1995), as limiting Outboard Marine to "statutory schemes designed for environmental protection." It is true that O'Brien distinguished Outboard Marine because it involved environmental issues. In a more recent case, however, the Second District Appellate Court, while noting O'Brien's discussion of environmental cases, found the principles stated in Outboard Marine to be applicable to underlying claims not concerning the environment. See General Star, 819 N.E.2d at 792-94. For the ACE Policies, which provide broad coverage and leave damages undefined, it is appropriate to apply the reading of "damages" set forth in Outboard Marine and its progeny.

The underlying complaints at issue all seek monetary relief. As plaintiff concedes, some seek monetary damages for other property that was contaminated, which clearly is damages because of property damages. Others seek compensation for stress and anxiety. As previously discussed, bodily injury includes being exposed to lead. Compensation for stress and anxiety related to such exposure would clearly be damages because of bodily injury. All of the cases seek compensation to pay for

medical monitoring of underlying plaintiffs who have been exposed
to lead contamination from the toys. Whether such relief is
legal or equitable in nature does not matter. In either case, it
requires payment or expenditure of funds to remediate bodily
injury in the form of exposure to lead. Cf. General Star,
821 N.E.2d at 794 (reimbursement for doctor evaluations). That
is damages because of bodily injury. That some or all of the
underlying complaints also seek injunctive or other non-damages
type relief does not preclude the duty to defend. There is a
duty to defend as long as at least one theory of relief
potentially falls within the coverage provisions of the ACE
Policies. Stoneridge, ___ N.E.2d at ___, 2008 WL 1976617 at *7;
Midwest Sporting Goods Co., 828 N.E.2d at 1098. Count II will be
dismissed to the extent it is based on purported failure to
satisfy the "damages because of 'bodily injury' or 'property
damage'" clause.

The ACE Policies contain an exclusion for: **"'Bodily
injury' or 'property damage' expected or intended from the
standpoint of the insured."** Some of the underlying complaints
allege that the toys were "purposefully" painted with paint
containing lead. Based on allegations in the underlying
complaints (reiterated here by defendants) that even minimal
exposure to lead can cause harm, plaintiff contends that the

complained-of bodily injury would have been expected by
defendants.

Illinois cases construing this exclusion have held that
"the injury is 'expected' where the damages are 'of such a nature
that they should have been reasonably anticipated (expected) by
the insured.' If the insured was consciously aware that the
injuries were practically certain to be caused by his conduct,
the injuries are considered 'expected' from the standpoint of the
insured and are excluded from coverage under the policy." Pekin
Ins. Co. v. Dial, 355 Ill. App. 3d 516, 823 N.E.2d 986, 991
(5th Dist. 2005) (quoting Westfield Nat'l Ins. Co. v. Continental
Cmty. Bank & Trust Co., 346 Ill. App. 3d 113, 804 N.E.2d 601,
608 (2d Dist. 2003)). To the extent it is proven that defendants
knew the toys contained lead paint, this exclusion may preclude
coverage of any related damages. That, however, is not an issue
regarding the duty to defend. There is a duty to defend unless
the underlying complaint can only be construed as being based on
such intentional conduct. See id. at 991-92 (citing West Am.
Ins. Co. v. Vago, 197 Ill. App. 3d 131, 553 N.E.2d 1181, 1185 (2d
Dist. 1990)). Here, all the underlying complaints include a
negligence and/or strict liability claim that would not require
proof of an intent to harm. Thus, even as to those underlying
complaints that also allege specific knowledge or an intent to

- 23 -

harm, there is still a duty to defend because there is at least one alternative theory in the underlying action for which the "expected or intended" exclusion would not apply. Count II will be dismissed to the extent it is based on the "expected or intended" exclusion.

Plaintiff also relies on the "sistership" exclusion which excludes: **"Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of: 1. 'Your product;' 2. 'Your work;' or 3. 'Impaired property;' if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it."** Overlapping the sistership exclusion is an exclusion for: **"'Property damage' to 'your product' arising out of it or any part of it."[7]** Defendants do not dispute that, to the extent any of the underlying lawsuits result in recovery of monies paid to purchase the toys, such recoveries would fall within this exclusion. Indemnity, however, is not ripe for resolution. Again, all the lawsuits contain

---

[7]This latter exclusion is the "business risk" exclusion pleaded in Count II and the Third Affirmative Defense.

other claims that do fall within the coverages of the ACE Policies. Since there are other potential liabilities that would be covered, there is still a duty to defend. Count II will be dismissed to the extent it is based on the "business risk" or sistership exclusions.

Since all the grounds raised in Count II and the Third Affirmative Defense fail on summary judgment, Count II will be dismissed and the Third Affirmative Defense will be dismissed.

Still to be considered are the other issues raised in footnote 4 of plaintiff's Reply. Two of the issues asserted in the footnote are not raised in the pleadings. Since they are otherwise without merit, it is unnecessary to consider whether they should be considered waived for purposes of summary judgment.

One issue asserted in the footnote is whether defendants understood the consequences of lead paint. This apparently is a reference to the "expected or intended" exclusion. In discussing that exclusion, plaintiff suggests that there may be a factual dispute. As discussed regarding that exclusion, the underlying complaints allege grounds for relief that do not require proof of intent. It is not material to the duty to defend issue whether defendants actually knew the toys had lead paint that could cause harm. <u>Taco Bell Corp. v. Continental Cas. Co.</u>, 388 F.3d 1069,

1073 (7th Cir. 2004). See also Midwest Sporting Goods,

828 N.E.2d at 1098 ("insurer may not justifiably refuse to defend

an action against its insured unless it is clear from the face of

the underlying complaint that the allegations set forth in that

complaint fail to state facts that bring the case within or

potentially within the insured's policy coverage").

Another issue asserted in the footnote is that the two

Learning Curve entities are not insureds. In its Complaint,

plaintiff alleges the Learning Curve entities are subsidiaries of

RC2. Compl. ¶¶ 8-9. It also admits that in answer to the

Counterclaim. Answer to Counterclaim ¶¶ 3-4. The Complaint also

alleges that the ACE Policies were issued to all three

defendants. Compl. ¶ 3.[8] Thus, plaintiff has admitted in its

Complaint that the policies were issued to the Learning Curve

defendants. Moreover, in support of its contention that the

Learning Curve defendants are not insureds, plaintiff cites an

ACE Policies endorsement defining insureds, which includes in the

definition subsidiaries that are 50% or more controlled by RC2.

Plaintiff provides an affidavit of a claim director stating that

he has never received information in response to his request to

---

[8]Paragraph 3 alleges the Ace Policies were issued to "RC2
Corporation." In the introductory paragraph of the Complaint, it
is stated that "RC2 Corporation" collectively refers to all three
defendants.

- 26 -

show that the Learning Curve defendants satisfy this requirement. That is not evidence that this requirement is not satisfied. Defendants provide an affidavit supporting that the two entities are wholly owned subsidiaries of RC2. Therefore, this fact is uncontested and it must be held that the Learning Curve defendants are insureds under the ACE Policies.

The other contention asserted by plaintiff is that defendants have not sufficiently provided the notice required under the Policies. This is an issue on which plaintiff insurer bears the burden of proof. <u>Dan Hayes Boiler & Repair Co. v. Illinois Masonic Med. Ctr.</u>, 30 Ill. App. 3d 616, 332 N.E.2d 463, 466 (1st Dist. 1975); <u>Illinois Sch. Dist. Agency v. Pacific Ins. Co.</u>, 471 F.3d 714, 722-23 (7th Cir. 2006); <u>Kelly v. Stratton</u>, 1985 WL 725 *1 (N.D. Ill. April 25, 1985). Therefore, in response to defendants' motion for summary judgment, the burden was on plaintiff to establish there is at least a genuine factual dispute that notice as to any particular underlying lawsuit was untimely. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Hicks v. Midwest Transit, Inc.</u>, 500 F.3d 647, 651 (7th Cir. 2007); <u>Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer</u>, 472 F.3d 943, 946 (7th Cir. 2007). Even ignoring that plaintiff has not pleaded lack of timely notice nor supported its contention with a sufficient legal argument, plaintiff fails to

provide sufficient factual support for its contention of deficient notice. Alternatively, if plaintiff is inartfully contending that it has not yet had sufficient discovery on this issue, it has not satisfied the requirements of Fed. R. Civ. P. 56(f). See Waterloo Furniture Components, Ltd. v. Haworth, Inc., 467 F.3d 641, 648 (7th Cir. 2006); Deere & Co. v. Ohio Gear, 462 F.3d 701, 706 (7th Cir. 2006). Lack of timely notice of any of the underlying suits is not a basis for denying summary judgment for defendants.

For the foregoing reasons, defendants are entitled to summary judgment dismissing plaintiff's lawsuit in its entirety. Defendants are also entitled to summary judgment in their favor on the first claim of the Counterclaim. No judgment will be entered at this time because defendants' counterclaim for reimbursement of attorney fees and other expenses already incurred has not been resolved. The parties shall promptly meet to discuss how to resolve such issues and submit a draft judgment order to the court at the next status hearing.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment [28] is denied. Defendants' motion for summary judgment [35] is granted. Plaintiff's complaint will be dismissed with prejudice. The final judgment, when entered, will declare that plaintiff has a duty to defend the underlying

- 28 -

lawsuits.  A status hearing will be held on July 16, 2008 at
11:00 a.m.

ENTER:

William T. Hort

UNITED STATES DISTRICT JUDGE

DATED:  JUNE  **26** , 2008